EPA asserted, LaGen concedes that many of those costs are not covered by ILU's policy because they are merely costs of complying with the CAA going forward and are not costs incurred to remediate a plume of existing pollution or pollution condition. LaGen does see coverage for three categories of costs, a capital upgrade on Unit 3 at the facility, the value of certain surrendered emissions credits, and a series of, quote, mitigation projects at locations far away from the LaGen facility. The categories each differ and each must be considered on its own terms. I'd like to therefore begin with the upgrade to Unit 3, which is most clearly a prophylactic compliance cost without any remediative purpose or effect. How do we know that it is a compliance cost? We know because the consent decree says so. It treats the selective non-catalytic reduction, SNCR, technological upgrade at Unit 3 exactly the same as the installation of SNCR at Units 1 and 2. They're treated the same way in paragraph 51 of the consent decree. They're treated exactly in the same sentence. It says that LaGen shall install SNCR at Units 1, 2, and 3. There's no distinction drawn whatsoever. Why did it do that? The reason was by reducing the emissions at Unit 3 by the installation at SNCR, the LaGen facility overall would come into compliance with the permit it had just negotiated with the EPA to obtain the consent decree. The undisputed evidence showed that a reduction at Unit 3 was necessary to keep those overall emissions below. Absent the SNCR on Unit 3, the overall emissions would have been almost 10,000 tons of nitrous oxide, whereas the permit, reflected in the consent decree, said that after 2015, going forward, the overall emissions had to be limited to just almost 9,000 tons of nitrous oxide. So in order to obtain the reductions to get to the almost 9,000 tons emissions level, LaGen had to install SNCR on Unit 3. That's why they agreed to do so with the EPA, to obtain compliance with the new permit. The district court itself even implicitly recognized that it was a compliance measure, not remediation. The district court said, well, it was a tradeoff instead of full compliance, and then the court just leapt to a conclusion and said, but that doesn't make it a compliance measure. Well, of course it does. That's exactly what was done. With full reductions at Units 1 and 2, they traded off fewer reductions there. The Units 1 and 2 were the units originally alleged to have inadequate technology on them, and in order to obtain an agreement with the EPA and obtain compliance with the new emissions level, they agreed, LaGen agreed, to install SNCR in addition, not only on 1 and 2, but also on Units 3. That is prophylactic compliance. As LaGen concedes, something that is prophylactic compliance with the CAA is not remediation of an existing pollution condition. That's consistent with what the, with the other realities of the consent decree and of this remedy. The permanence of the installation of SNCR at Unit 3 tells you you're not remediating some fixed amount of past excessive pollution. It's not like there was, you know, a thousand tons in 2001 that were out there that had been emitted and need to be offset or remediated, because nobody, that's not, this is not about remediating a thousand tons. This is about a permanent change to Unit 3 that will forever ensure this reduction in order to comply with the new emissions limit. You've used the word remediate quite a few times, but the policy speaks of mitigate and abate as well as remediate. That's correct. That's part of the definition of remediation expenses, and all of this, those terms all are backward-looking terms. Remember, the pollution condition has to occur as a result, or excuse me, the remediation cost, mitigation, abatement, has to be incurred as a result of a pollution condition. So it has to be something that exists in the past, not upgrading your facility, adopting new factory to have lower emissions in the future. You will not find, and I hope the court asks my opposing counsel in his argument, for any case in any jurisdiction, whether it's a state case, a federal case, whether it's unpublished, published, district court, trial court, appellate court, that finds that this kind of modification to a facility constitutes a remediation expense that's covered by any kind of policy with any kind of language. Is this standard language? Yes, this is a form of pollution liability policy. It's industry-wide. This isn't an individually negotiated? It's not, right. The latter is definitely true. This was not a manuscript form. Is it this company or do other companies use it? I mean, typically, a lot of times we see policies that a lot of different people use. I'm just trying to find out, is it just this company's policy, or is this used industry-wide? I can't tell you, and it's not in the record that, at least I'm not aware that it's in the district language with all its detail and structure, is used industry-wide, whether it's from the insurance services office and literally used industry-wide. It is not a unique policy. That much I can tell you. This is a very common policy that was adopted for very specific reasons, which were basically twofold. There was a pollution exclusion written into CGL policies starting in the 70s and the 80s for public, some states required them, and other insurers just didn't want to be insuring pollution, so they excluded it. These policies were written to allow companies that were emitters of potential pollutants to obtain some coverage. So you wouldn't increase the price of a CGL policy for somebody who's just running a distribution center or something. And this allowed somebody who was an emitter to actually obtain coverage without increasing general CGL policy. So that's what a pollution liability policy is doing. The other thing it does is solve a problem under CGL policies that cover damages from an occurrence, and there was a huge debate, and it's still out there, as to whether or not response costs constitute damages for an occurrence. That's what this policy and others like it solve for. They say that it does cover remediation costs. But by covering remediation costs, nothing in that suggests that any change from the classic insurance proposition that you don't insure technological changes in order to insure to prevent future problems. There's no policy that does that. And as I say, so far in all the briefing to date, the other side has yet to cite even one case from anywhere that recognizes this kind of cost as something that's covered by any kind of policy. What do we do with the reality that when you make a technological change that does reduce emissions or whatever, pollution, whatever term we would call it, going forward has the consequence, in fact, of reducing the overall level, in other words, of remediation itself. The lines between remediation, prospect and retrospective, get blurred in terms of the effects. Yeah, your question is almost verbatim from something Judge Lippez said in his wonderful Energy North decision, which I'll refer the Court to, in examining this line. And what Judge Lippez says, which I think makes a lot of sense, is when you've got the line makes sense when you have existing pollution out there, and you do something to deal with the existing pollution. You might put up a barrier if it's on the land and it threatens to spread further. You would be mitigating it by putting that barrier there. That would, it's true, stop future pollution, but you're stopping future pollution of existing pollution. What you don't see, what he says would be beyond the line, and you don't see coverage of, is a technological change that exists for the sole purpose of preventing future pollutants. The pollutants don't yet exist. There is no nitrous oxide being emitted, you know, this technological change deals with nitrous oxide being emitted, you know, in 2018 and 2019. That's not, insurance policy deals with nitrous oxide that was emitted in the past. And so to the extent that you do something, if you can identify some kind of remedy that deals with nitrous oxide or any other kind of air pollutant, and there might be some air pollutant that hovers or creates an immediate problem in the immediate area that has to be dealt with right away while it's still there, sure, a pollution policy would cover that and deal with solving that problem. It doesn't deal with a technological change designed to prevent that problem from occurring in the future by upgrading your facility and preventing those future emissions. Insurance policies are about dealing with existing problems, not future problems. Now, if I could, there's two other categories, which are different. That's not to say they're not covered, but they are different from the easiest category, which is the SNCR. The second one is the emissions credits, and our submission is those are also a form of compliance because they were surrendered in order to obtain an agreement with the EPA to avoid additional modifications to Units 1 and 2. And not only are they compliance, but even if they're not compliance, they're still forward-looking. They're not dealing with, they're not remediating an existing body of existing pollution that's out there. And here I think the Synergy 3 case from the intermediate court in Indiana is the best example where the court specifically addressed emissions credits from the exact same program, EPA program, that was involved here. The EPA obtained emissions credits from that emitter, and the court in that case said they're not covered because they're solely forward-looking. They deal with future emissions. They don't do anything to deal with past emissions, which is what pollution liability policies are all about. And so that's our submission on that. I will say they are different from the SNCR because they're not as direct a compliance measure in the same way, and they were referred to in this prior decision by the EPA as at least referred to as a mitigation measure, which the policy by its terms covers. Now our submission on that is that, although the EPA refers to them as a mitigation measure, the EPA can't determine whether something's covered. It just calls whatever it calls mitigation. The question in any given case is when the EPA obtains a specific remedy, is that mitigation within the terms of the particular policy that's supposed to provide coverage for past pollution? And the surrender of these particular credits does nothing to solve a particular past problem of particular past excess emissions because they're not tied to any past excess emissions. They just say, in the future, forever. Again, they're permanent. If this was a... But mitigate has a forward cast to it, in a sense, on its meaning, doesn't it? And I think, again, Judge Lepez explains mitigation in the environmental law context and elsewhere would avoid a future problem from existing pollution. So if you have a plume of air pollution that's out there and you're trying to mitigate its effects, there's lots of things you might do to mitigate what that plume of air pollution or water pollution or ground pollution is doing. But here we're talking about a surrender of emissions credits for the emission of nitrous oxide and sulfur dioxide that's never occurred. It hasn't yet occurred. That's what this is all about. This doesn't do anything to deal with existing nitrous oxide and sulfur dioxide. The last category of expenses that's at issue here are what's referred to as environmental mitigation projects. These are not covered for basically an entirely different reason. These, in theory, are the kind of remedy that... They're not compliance by any stretch because they don't have anything to do with the current emissions levels and future emissions levels of the facility. So they could be considered remediation in theory if they were actually remediating some existing air pollution or other form of pollution. The problem with the environmental mitigation projects is they don't satisfy the policy's geographical proximity requirement, which is quite stringent. What the policy covers is not just any remediation of anything. It covers remediation of, quote, a pollution condition, which is, and I quote, on, at, under a covered location, or beyond the boundaries and migrated from the covered location. So the only kind of costs that are covered are remediation that deals with a pollution condition on, at, or under a covered location. That's not at issue here because all of the mitigation projects are off-site and, in many cases, many miles off-site. So the question is, has anybody shown that they are dealing with a pollution condition that migrated from the log-in's covered location? And nobody's even tried to make that showing whatsoever. On their face, they aren't something that, well, would have migrated from the location. One of them is a project 50 miles away. Another one is a project 10 miles away. It's money to the Forest Service and the Park Service to do what they want to do with matters under their control. The state projects are literally all over the state. There's no geographic specification whatsoever. They're just anywhere in the state. The state wants to negotiate these projects. So there's no connection whatsoever to the facility and certainly no showing, as there must be, that these are mitigating a pollution condition that migrated from the log-in facility. Absent that showing, these aren't covered for that distinct reason. If the court has any other questions, if not, I'll reserve the balance of my time. Thank you. Good morning, Your Honors. John Heintz of Blank Rome for Louisiana Generating and NRG. Let me start with the proposition that there is no existing pollution condition. I argue, as this court a previous panel determined, promise to pay claims and remediation costs lodged and incurred for an existing pollution condition at Big Cajun II, the facility that's at issue. That's by endorsement in the policy. It is established that it was an existing pollution condition, and that existing pollution condition was the excess emissions of SO2 and NOx. So that existing condition gave rise to a suit by EPA and Louisiana Department of Environmental Quality, and among the things they sought were compliance at the two units they said were out of compliance, one and two, and mitigation for the past excess emissions and the harm that those excess emissions caused. This court, at the previous panel, determined that those claims for those remedial mitigative abatement type measures would be covered if that's what the case resulted in. The parties in the underlying case disputed what compliance constituted. They disputed the extent to which mitigation would be required, and they reached an agreement and they agreed to certain measures for units one and two, which the EPA then agreed would be in compliance if met, and those were capital upgrades, and for which they gave releases of civil liability up to the date of the consent decree, and then they agreed on mitigative measures, and it's very clear that in the  which the EPA has gone to trial, EPA's expert would have presented evidence with regard to the excess emissions he calculated and why SNCR at unit three and surrender of allowances in particular would be mitigation for those excess emissions. The so that is the context in which this settlement is resolved. The fact that there is compliance at unit one and two and that there is now a newly agreed  does not make the measures that didn't bring unit one and two into compliance, compliance. That plant wide limit didn't exist before and the SCNCR, the SNCR at unit three did far more than to satisfy that plant wide limitation. Now as to mitigation, air pollution presents a challenge and Congress in adopting the Clean Air Act recognized that total atmospheric loading of things like SO2 and NOx had to be limited in order to protect the public health and the environment. I just want some order of magnitude here. What are the annual premiums for this coverage? Your Honor, I don't recall that off the top of my head. Order of magnitude? It's in the fifty to a hundred thousand dollar range maybe more, but I don't What are the capital costs for this? Well, the costs for which ILU has been found liable including defense costs are approaching 47 million dollars and the limits were 50 million. The capital costs for units one and two were significantly more than that and of course they're not included in our claim. There's an inverse relationship between the clarity of language and the amount of money at issue. There's an inverse relationship between the clarity of language and the amount of money at issue. Your Honor, I have done this for a long time and I would observe the same thing. The point here is that because air pollution when emitted doesn't stay in place. It's in the atmosphere. It's an existing condition as the policy states about Big Cajun. You can't say that's Big Cajun's SO2 and that's some other facility's SO2 and it's  a lake where it's determined that the lake can sustain ten pounds of pollution a year and meet water quality standards and someone deposits fifteen pounds in year one and it makes up for that by only depositing five in year two so the cumulative total after year two is back to where it would have been had they complied in both years one and two. That's what these mitigation measures are. It's used in clean water. You trade off the restoration of one area of wetlands as mitigation for having damaged or destroyed another area of wetlands. That is considered mitigation in the environmental context. There is no environmental law meaning that's limited to response costs. What do you do about the specific the third category that Mr. Hacker referred to as environmental mitigation projects? He mentions no geographical proximity and that they're suggest that they're somewhat unrelated if it has to do with the Forest Service and things like that. How does that satisfy the policy? Your Honor and there is the EPA mitigation guidance memo in the record which outlines EPA's approach to this. It does require a nexus to the pollution condition that is subject of the Clean Air Act case it is addressing. Indeed the requirements have to have an impact on the target pollutants such as SO2 and NOx and mercury. The EPA has rejected first of all they specified there was agreement in the negotiations that X number of them would be done and they're defined in the agreement. Then as to the remaining amounts Lawgine had to submit projects for approval and EPA rejected two because they said they didn't have a sufficient nexus to the pollution condition we're requiring you to mitigate. The EPA if these projects are approved is satisfied that the nexus to the pollutants and to the facility is sufficient. They do have a regional limitation we can't go mitigate in Maine they won't approve that but they have to have some impact on reducing either the direct emission of NO2 and NOx and SO2 or to ameliorate their byproducts such as nitrogen in the soil and the projects do meet those requirements. To me that was one of the three categories of relief in the complaint that the earlier panel found would trigger coverage and if awarded or granted would trigger it the duty to pay. What about the emissions credits which Mr. Hacker says are compliance rather than remediation? Your honor again in litigation EPA was taking the position and it's experts report in the record shows this he calculated how much reduction in future emission from the surrender would offset some of the past excesses certainly not all that he had calculated had resulted from the non-compliance in earlier years of operation before the suit was brought and council asked the court to ask me whether there's a case well I would point to the district court in Maryland that considered both the imposition of capital upgrades on a plant as possible mitigation for excess past emissions this is the Westfaco case and the surrender of allowances it concluded that it would be inappropriate to require the upgrade of the plant because Westfaco was no longer the owner of the plant not because it wouldn't have mitigation effect or would be on the power of the court under the Clean Air Act on the other hand it laid out criteria for the approval of surrender of allowances and ordered further proceedings to address the criteria that with regard to the quantity and the nature and the term over which these allowances would be surrendered so there the court very clearly treated it as mitigation and and as well as in the analytical context the possibility of requiring changes to the power plant itself but for the fact that it was no longer owned by the defendant so all these measures in the Clean Air Act are mitigation and abatement and neutralization the policy definition of remediation costs goes far beyond plugging a hole in what CGL policies didn't cover because of the pollution exclusion it's not limited to response costs it says abatement mitigation which as your honor pointed out do have a prospective component to it abating a public nuisance is largely prospective in the way it is used in the case law and these are words of common usage these are not words of special environmental usage and they fully satisfy the broad purpose of this policy and ILU's specific agreement that the existing air condition pollution condition at Big Cajun 2 was a to be treated as a known condition under the policy for which there would be cover if there were claims there was a remediation cost that arose out of it the prior panel clearly unequivocally determined under the plain language of the policy and this consent decree imposes relief secured relief for the agencies that satisfy the request for reliefs under paragraph 678 in the complaint which the prior panel specifically said were the ones that were triggering the duty to defend and since the case ultimately was resolved with LAWGEN undertaking those activities those activities are covered and the cost associated should be paid if there are no other questions I think I've addressed council's arguments and I'll leave the rest to our briefs Thank you Mr. Hines Mr. Hacker you saved time for rebuttal Thank you Thank you your honors just a few points first focusing on the prior decision which Mr. Hines referenced that of course was only about the duty to defend which this court correctly described as exceedingly broad and the issue there was on the complaint as pleaded and read broadly as one must do at the complaint stage was there a possibility that the EPA ultimately could obtain some remedy unknown at the time that would be covered by the policy that's how the duty to defend works and we had an argument that said given the nature of the Clean Air Act there was no possibility that that would be true and this court disagreed and said what remedy would be covered any kind of remedy that actually remediates, mitigates, cleans up the pollution of any kind or reducing future emissions cleaning up past excess emissions because if there's a showing that there is a direct connection to a given past excess emission that might qualify as remediation but that's what's missing here nobody knows what how much there was in excess pollution, some fixed amount you agreed there were some or you wouldn't have agreed to future reductions there were excess emissions because they violated their permit, that's true but we're talking about a permanent change forever and ever and ever which necessarily isn't just remediating whatever few years of excess emissions there were is there a fact question as to that? I think there would be a fact question except that the other side has made no showing and on the face of it the consent decree again treats, talking just about the SNCR SNCR at unit 3 the same as units 1 and 2 in order to achieve the SNCR is added at unit 3 in order to achieve compliance with the 9,000 pound limit on the theory your honor that anything that reduces future emissions, offsets or remediates past emissions, that's counsel's argument everything done at units 1 and 2 also would be remediation, also would be covered and everybody agrees that they're not covered because they're about obtaining future compliance that's what unit 3 is about, it's obtaining future compliance for other kinds of pollution for pollution in the lake that Mr. Heintze gives the example of, if you see a plume of pollution and you take steps to deal with it, including first of all stopping the current flow Judge Lipez's opinion, Energy North points out that doing that kind of thing can be understood as remediation, doing something else to contain the existing pollution that's remediation, even though it's got that future looking effect, but if you also say, you know what let's build a different factory that doesn't emit this kind of thing into the water, that will also reduce it in the future but there are zero insurance policies and zero courts in this country that would say that that future effect is something that's covered, that insurance policy is supposed to build you a new factory so you stop polluting the water and that's what's happening here, it's not an entire new factory, but it's technology at one of the main emitting parts of the factory, they're saying if you put this on we'll reduce it in the future and the argument is because that has the effect of reducing future emissions, which just descriptively offsets past emissions therefore it's remediation, but again that doesn't, no court has ever said that including the West Vaco Court let me just try a simple hypothetical, suppose you had a situation in which there was one chimney that had been emitting soot for 20 years and that an identifiable group of 50 structures in the neighborhood had been blackened, remediation would certainly include paying to replace or clean the roofs or clean up other things to get rid of but you're saying that improving the chimney in some way or burning a different fuel or putting a screen on top so that the pollutants don't escape would not ever be included within either remediation or mitigation or abatement, not even abatement not under this context because you'd be talking about abating the existing pollution if you're improving the chimney so that in the future you don't emit black soot at all and just have a different chimney or you don't have a chimney you change the way that the product is built in order to avoid those future emissions that's not a covered form of remediation expected. So your view under my hypothetical, I understand it's overly simplistic, would be that it would cover only the cleaning up of whatever soot has fallen on the surrounding structures and it might also include, to the extent there's a plume of soot out there or something, stopping it at the moment so that it doesn't, that soot isn't there anymore and that soot can go away, but it's not doing something would include a change to the chimney putting something on top of it putting a filter on it like a temporary patch so that the existing pollution stops so you're dealing with the existing pollution, might be remediating that existing pollution but doing something that deals with pollution in the future so that you change the way you do business in order to not do this thing that's not compliant with the law that's what isn't covered and I respectfully submit that my opposing counsel has proved my point in his complete inability to cite any case where that's ever been covered the West Vaco case, on it's face, doesn't cover it and a single district court decision in Maryland certainly wouldn't establish that it's covered under New York law but if this kind of remedy were covered, you would see decisions you would see policies paying for this kind of capital upgrade, you don't see that and you don't see decisions agreeing to do that, in fact, to the contrary you consistently see decisions rejecting it, this court should too Thank you.